UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YVONNE DOWNIE,                                    Civil Action No. 1:16-cv-5868

                Plaintiffs,                              Hon. J. Paul Oetken

-v-

CARELINK, INC., and ENA BAILEY et al.,

                Defendants.


## AFFIDAVIT OF ENA M. BAILEY

STATE OF NEW YORK   )
                               ) ss:
COUNTY OF QUEENS   )

      ENA M. BAILEY, being duly sworn, deposes as follows:

      1.     Affiant.  I am the President and principal owner of Carelink, Inc. ("Carelink"); and together with Carelink, I am a Defendant in the above-captioned action (together, "Defendants").  I make this Affidavit based on personal knowledge, except where stated upon information and belief, which facts I have reason to believe are true.

      2.     Purpose of Affidavit.  I make this Affidavit to place before the Court certain facts relevant to Defendants' opposition to Plaintiff's Motion for Class Certification.  For each of the reasons set forth herein and in Defendants' Memorandum of Law in Opposition to Class Certification ("D. Memo."), I respectfully request that the motion for class certification be denied.

      3.     Background.  Carelink is a Licensed Home Care Services Agency ("LHCSA"), that provides home care services to elderly and ill patients, in their own homes, who cannot care

for themselves, but who do not require the level of care normally provided by a hospital or nursing home. Carelink provides these services both in New York City and in Long Island.

4. Plaintiff Yvonne Downie ("Plaintiff" or "Downie") worked for Carelink from October 2012 through August 2015. My records show that she worked virtually exclusively on so-called "live-in" cases where an aide is assigned to stay with the patient overnight, on a 24-hour shift. On June 21, 2016, Plaintiff filed suit against Defendants, alleging a series of State-law claims, and what I understand to be a single Federal-law claim, all of which concern alleged wage and hour violations and related issues.

5. There are approximately 1584 LHCSA home care agencies like Carelink in New York State, according to: profiles.health.ny.gov. Carelink, with only about 150 employees, is among the very smallest of these agencies, some of whom employ more than 5000 to 10,000 home aides, or more. It is my understanding that hundreds of thousands of patients are serviced by the more than 150,000 home care workers in New York, every day.

6. <u>NY DOH and NY DOL Regulations</u>. Carelink, like most other LHCSAs, employs certified home health aides and personal care aides, such as Plaintiff, to provide the services specified in the patient's "plan of care," as required by the N.Y. Department of Health ("NY DOH") regulations, such as 10 N.Y.C.R.R. 766.3. But Carelink does not itself determine the "plan of care" or even the "level" of care medically required for any patient. Rather, those levels of care are clinically determined by the agency designated by NY DOH, typically a Managed Long Term Care provider ("MLTC"), or a nursing home or hospital, who then gives the case to agencies like Carelink to perform the specified services at the patient's home.

7. Carelink and similar LHCSAs have no say in the number of hours of service authorized under NY DOH rules, or in the amount of reimbursement that is provided as

compensation for each case. Rather, those hours and amounts of reimbursement are set in advance by the MLTC following the requirements of the NY DOH, based on the clinical diagnosis of the patient's conditions and needs. Carelink is paid only for hours medically-approved and authorized by NY DOH rules, and does not make this determination.

8. Reimbursement for those authorized service hours constitutes the vast majority of Carelink's revenue. From these reimbursements, Carelink must pay all of its Aides' wages, its taxes, its overhead, insurance, office costs, supervisory salaries, payroll processing, mailing, regulatory compliance, and virtually every other cost of its business. Accordingly, I believe that home care is generally considered a "low margin" business.

9. With respect to "24-hour live-in" cases on which Plaintiff worked, these cases are clinically assessed by medical personnel by the MLTC, pursuant to NY DOH regulations and procedures, and if 24-hour live-in care is called for, they must meet a specific <u>clinical</u> designation: the patient's "need for assistance is sufficiently infrequent" such that the patient is "likely to obtain, on a regular basis, 8 hours of sleep, 5 of which are uninterrupted." I am advised that this is set forth in NY DOH regulations, including, 18 N.Y.C.R.R. §505.14(a)(4). Based on this clinical diagnosis, Carelink, like other LHCSAs, is <u>authorized to provide only 13 hours of service</u> within the 24-hour live-in shift, and is provided with <u>13 hours of reimbursement</u> for "live-in" services its aides provide, premised on the medical determination that the aide will routinely be able to sleep 8 hours (5 uninterrupted) and take 3 hours of meal breaks, and thus need only be available for work for the remaining 13 hours.

10. Following, and similar to these NY DOH regulations, there are New York Department of Labor ("NY DOL") regulations, which Carelink has always followed, that specify that a LHCSA like Carelink is only required to pay a home aide who works an overnight shift of

3

24-hours in a live-in case, for 13 hours, if the Aide receives 8 hours of sleep (5 of which are uninterrupted) and 3 hours of meal breaks (see Appendices 1-7 to D. Memo.). Based on these rules, it is my understanding that up to 11 hours of time actually taken by the Aide for meals and sleep, under the above-conditions, may be deducted from the 24-hour shift. I believe this complies with NY DOL (and NY DOH) regulations which have been in effect for many years prior to this lawsuit. I also know, from more than 20 years of experience in the home care industry, that this practice is virtually uniform throughout the industry.

11. <u>Recent State-Court Cases Involving Live-In Pay</u>. I am aware of a series of State-court decisions relied upon by Plaintiff (see P. Memo. pp. 2-5) that have caused a calamity in the home care industry generally, because they appear to suggest (if they are upheld), that an Aide can sue and seek additional hours of pay from an agency like Carelink who followed the Regulations of NY DOL, and the similar regulations of NY DOH, that provide for only 13 hours of pay and reimbursement in the normal live-in case, rather than a full 24-hours of pay.

12. The cases described above, if they continue to apply, have created a significant outcry in the home care industry; I believe this is because they have threatened the viability of many home care agencies. Based on my experience, 24-hour live-in cases are a meaningful percentage of overall home care work, and most LHCSAs accept 24-hour live-in cases. Once accepted, these cases can not be abandoned nor readily tendered back. Carelink (and, I believe, other LHCSAs), are now threatened with a serious, often overwhelming risk of retroactive liability, merely for following for years what we understood the law to be, based on NY DOL and NY DOH regulations and opinion letters. I believe that the size of this potential liability is so great that many home care agencies would be forced out of business, including Carelink. Carelink's continued viability as an entity and an employer is at stake here.

13. <u>Recent NY DOH advice</u>. Recently, NY DOH advised the home care industry through a published notice that, despite the State-law cases referred to above, NY DOH still will only reimburse agencies like Carelink for 13 hours of services on 24-hour live-in cases, and will <u>not</u> change that reimbursement level – unless the clinically determined level of care of the patient changes to a more severe clinical assessment and level of care. (See Appendix 7 to D. Memo.). Carelink can not unilaterally change the clinical assessment or level of care. This means that Carelink, and many other similar LHCSAs, are placed in an untenable bind: we can not abandon the live-in cases; we can not unilaterally change the level of care clinically set for these cases; and we can not receive sufficient reimbursement for the cases to pay for 24-hours of pay that some State courts appear to think is required, notwithstanding NY DOL's and NY DOH's regulations to the contrary. We respectfully urge that this Court to defer to and to uphold the longstanding, pre-existing NY DOL regulations, and reject class certification sought by Plaintiff here of a class seeking 24-hours of pay for each live-in shift.

14. <u>NY DOL Emergency Rule</u>. Very recently, NY DOL enacted an "Emergency Rule" that specifically confirms and reinforces the previously-existing exclusion of 11 hours of sleep and meal times in a 24-hour live-in case, as described above (see D. Memo., Appendix 1). The Emergency Rule, as I understand it, was enacted to avoid a crisis in the home care industry due to the State-law cases referred to above, that threatens, in NY DOL's words, the "collapse of the industry." I understand that the Emergency Rule was enacted <u>after</u> the State-law cases were issued, and therefore was not before those courts when they ruled.

15. <u>Aides Know the 13-Hour Rules</u>. Carelink employees are trained, at initial orientation and also at the required, semi-annual "in-service" training sessions, that they will be paid for 13 hours of time on each 24-hour live-in shift, except in unusual circumstances when

sleep or meal breaks are interrupted – which they must report to Carelink if they wish to be compensated for those interruptions; this was routinely communicated to our aides. Our records show that Ms. Downie never submitted any complaint to Carelink related to alleged sleep or meal interruptions, and I heard her repeatedly admit this at her deposition when asked about patients. (Accompanying Defendants' opposition papers is an Appendix of Deposition Extracts, and the Court is respectfully referred to Ms. Downie's deposition ("Downie Dep.") pages 102, 111, 120, 122, 124, 125, 127-28, 129-30, 137-38).

16. <u>Sleep-Interruption Claims are Individual in Nature</u>. If Plaintiff were now to claim that she is seeking certification of an alternate "class" of those whom she alleged had intermittent sleep or meal interruptions that were allegedly not compensated (although she does not appear to be seeking such a class), I believe that any such "interruption" claim is not appropriate for class treatment, for the following reasons. In my experience, sleep and meal interruptions by patients, when they occur, are not regular or routine; rather, these types of interruptions are infrequent and sporadic, and when they occur, they normally vary in frequency, duration, and timing for each patient, and for each given day or incident. To address these types of individual varying instances would appear to me to require resolution of many, many individual questions, such as: when these incidents occurred; the credibility of the person asserting them; how long they lasted; whether they interfered with 5 uninterrupted hours of sleep; whether the interruption was adjusted by a subsequent break; and whether the aide notified anyone at Carelink.

17. <u>Plaintiff was Paid in Excess of Minimum Wage</u>. Plaintiff was employed from October 2012 through August 2015. It is my understanding that the minimum wage during that period was in 2012 through December 30, 2013: <u>$7.25</u> per hour; from December 31, 2013 through December 30 2014: <u>$8.00</u> per hour; and from December 31, 2014 through the end of

Plaintiff's employment in August 2015: $8.75 per hour. During each such period, Plaintiff was at all times paid an hourly rate in excess of minimum wage: her wages started at $9, and were later increased to $10 per hour. Her wage-level always exceeded minimum wage by at least one dollar per hour for each 13-hour shift, which more than offsets an additional hour of pay at minimum wage per day.

18. <u>Carelink Followed the U.S. Department of Labor's Position on the Companionship Exemption.</u> At some point in 2015, Carelink became aware that the previously existing "companionship exemption" from overtime was potentially being revised by the U.S. Department of Labor; but we learned that this revised regulation was not implemented for most of that year, due to a lawsuit. We followed this closely through the industry association of Home Care Providers, known as the HCP. As soon as we learned that the litigation and had concluded and the revised regulation was now being implemented, we followed the advice of the U.S. D.O.L. in good faith and implemented full overtime pay for weekly hours over 40, on or about the pay period immediately after October 13, 2015 – the date U.S.D.O.L. advised was the "effective date" of the new regulation – even though we understood that U.S.D.O.L. had also given a grace period of 30 days, until November 12, 2015.

19. <u>Plaintiff is Not an Adequate Class Representative</u>. I was personally present when Plaintiff gave her deposition in this case on July 12, 2017. At that deposition, I observed that Plaintiff exhibited what I would describe as serious memory problems, or alternatively, credibility problems. She testified that she "doesn't remember" many dozens of times during the deposition. In many instances these lapses in memory were about things that I believe a normal person would surely remember. For example, she was asked if she remembered filing a lawsuit against another home care agency. She couldn't remember. She was asked whether she ever

settled a case or received money in any lawsuit: she couldn't remember. She was asked if she had ever given her deposition in any other matter: she couldn't remember. Carelink's lawyer showed her a complaint filed in 2015, and amended in 2016, with Ms. Downie as the sole named plaintiff, and showed her that they both included her signature, and further, that the lawsuit was as settled in July 2016 – just a year before the deposition. Despite this, Ms. Downie still insisted that she "couldn't recall" (Downie Dep. pages 15, 16, 29, 78-79, 80).

20.     In addition, even though Plaintiff testified that English was her only language (Downie Dep. 30), it appeared to me that she was unable to fully to comprehend the questions asked on many occasions, based on my observations (Downie Dep. 16, 18-20, 31-34, 37, 42-43, 44-48, 69, 86, 88-89, 93, 98, 113, 162, 166-67, 179-80). Many things she could not recall related directly to allegations in her Complaint (Downie Dep. 81, 99-146, 162-63, 168).

21.     Based on my observations, I also formed the opinion that Plaintiff did not sufficiently comprehend her own claims. For example, at the deposition, she insisted that she was paid for "12 hours" for each 24-hour live-in-shift. However, Carelink's records uniformly show payment for at least 13-hours for any full 24-hour live-in shift, and her own payroll records (attached to her Declaration on this motion) likewise show that her hours were in multiples of 13, directly corresponding with 13-hour payments for each live-in shift. I believe this demonstrates her inability to comprehend important specific facts and evidence necessary to her claims, and accordingly, based on all of the above, that she is not capable of adequately performing the duties of a class representative.

For each of these reasons and those set forth in Defendants' accompanying brief, Carelink respectfully requests that Plaintiff's motion for class certification be denied.

_____
ENA M. BAILEY

Sworn to before me this
10, day of November, 2017

_____
Notary Public

My Commission Expires on:

CAROLYN TUFANO
Notary Public - State of New York
NO. 01TU6080052
Qualified in Nassau County
My Commission Expires Jan 29, 2018

104754.1 11/10/2017